BASK MCDONOUGH HOTEL, LLC,

        Plaintiff,

v.

AMERICAN HOTEL DEVELOPMENT
PARTNERS, LLC, ALESSANDRO A.
GIANNINI, and CLYDE J. HARRIS,

        Defendants.

CIVIL ACTION NO.

1:10-cv-1883-JEC

## ORDER AND OPINION

This case is before the Court on plaintiff Bask McDonough Hotel, LLC's Motion for Summary Judgment [33]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff's Motion for Summary Judgment [33] should be **GRANTED**.

## BACKGROUND

Plaintiff seeks enforcement of a promissory note obligating defendants to pay plaintiff $180,000.00 (the "Note"). (Note, attached to Jetha Aff. [33] at Ex. 1.) Defendants do not dispute that they have defaulted on the Note, but instead claim that they owe plaintiff nothing because the parties cancelled the Note in exchange for plaintiff taking a partial ownership in a development venture.

In the alternative, they argue that plaintiff cannot recover because of waiver or estoppel. In support of these defenses, defendants set out a lengthy series of communications between the parties. Plaintiff does not dispute these facts,[1] but disagrees with their legal implications.

## I.  THE NOTE

In or around April 2007, hotelier Salim Jetha ("Jetha")[2] contacted Clyde J. Harris ("Harris") regarding an opportunity for the joint development of "new construction" hotels and apartment complexes. (Defs.' Statement of Material Facts ("DSMF") [39] at ¶¶ 5-6.)  At that time, Jetha had never participated in the construction of a new hotel, having only owned and managed existing hotels. (*Id.* at ¶ 7.)  Jetha wanted defendant Harris and his

---

[1]  Plaintiff contends that defendants have offered "self-contradictory" explanations for why they have not paid the debt. Plaintiff asks the Court to construe defendants' contradictory testimony against them pursuant to *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28 (1986)("if on motion for summary judgment a party offer[s] self-contradictory testimony on the dispositive issue in the case, and the more favorable portion of his testimony was the only evidence of his right to a verdict in his favor, the trial court must construe the contradictory testimony against him.").  Rather than weigh in on the genuineness of defendants' testimony, the Court will rule on the merits of the position as presented by defendants in their response to summary judgment.

[2]  Defendants contend that Jetha and Bask are one and the same. Plaintiff does not dispute this point and, for the purposes of summary judgment, the Court treats them as one.

2

American Hotel Development Partners, LLC ("American Hotel") co-principal, defendant Alessandro Giannini ("Giannini"), to be meaningfully involved in any deal. (*Id.* at ¶¶ 8-9.)

Jetha and defendant Harris ultimately agreed that a lot owned by Lake Dow, North Corporation ("Lake Dow") situated in McDonough, Georgia, was the most suitable location for the proposed hotel development (the "Property"). (*Id.* at ¶ 14; Pl.'s Statement of Material Facts [33] at ¶ 2.) Thereafter, in or around July 2007, Jetha formed his holding company, plaintiff Bask McDonough Holding, LLC ("plaintiff" or "Bask"), which paid Lake Dow $50,000.00 in exchange for an option to purchase the Lake Dow Property at a sales price of $500,000.00 (the "Option Purchase Agreement"). (DSMF [39] at ¶ 15.)

Plaintiff Bask and defendant American Hotel executed an "Assignment Agreement" conveying the option on the Property to American Hotel. (*Id.* at ¶ 21.) In connection with that agreement, American Hotel paid Bask $57,045.00 in reimbursements for expenses to date and executed a note providing that defendants would pay Bask the sum of $180,000.00 on or before June 2, 2008 (the "Note"). (*Id.* at ¶ 22.) The Note's operation was expressly conditioned on Lake Dow's consent to the assignment of the Option Purchase Agreement from Bask to American Hotel. (Note, attached to Jetha Aff. [33] at Ex. 1.)

3

Both the Assignment Agreement and the Note were signed by the parties on February 21, 2008. (DSMF [39] at ¶ 23.)[3]

Promptly after executing the Assignment Agreement and Note, American Hotel commenced its efforts to obtain financing for the development through its primary lending source. (*Id.* at ¶ 26.) Jetha remained in contact with defendant American Hotel during this time and his expressions of interest conveyed a sense of ownership in the project. (*Id.* at ¶ 27.) Moreover, Jetha interacted with third parties on behalf of the venture, and gave the impression that he was in a partnership with American Hotel. (*Id.* at ¶¶ 28-29.)

In or around April 2008, the proposed loan to defendant American Hotel's favored lender fell through, and it became necessary to look at other financing options for the construction of the development. (*Id.* at ¶ 30.) At that point, Jetha attempted to obtain financing through some of his own contacts, referring to Harris and American Hotel as his "development partners." (DSMF [39] at ¶ 31.) When

---

[3] According to defendants, the parties had long contemplated that plaintiff would have an equity stake in the development. (DSMF [39] at ¶¶ 16-17.) Rather than establish an equity interest at the outset, the parties agreed to assign the Property to help simplify the loan process. (*Id.* at ¶¶ 18-19.) Once this loan was obtained, American Hotel anticipated that it would convey an equity interest in the development to Jetha, Bask, or one of Jetha's other entities. (*Id.* at ¶ 20.) The parties also apparently anticipated that a construction loan would be obtained before the Note matured, and once this loan closed, there would be sufficient funds to close on the Property. (*Id.* at ¶¶ 24-25.) None of these intentions appear to have been reduced to any sort of writing.

4

these sources of financing fell through, Jetha negotiated an extension on the Option Purchase Agreement with Lake Dow. (*Id.* at ¶¶ 32-33.)

## II.   THE "MODIFICATION"

Given the unanticipated delay in procuring the construction loan, in May 2008, Jetha and defendant American Hotel began discussing the prospect of moving forward with the purchase of the Property, as hefty extension fees for the Option Purchase Agreement could be avoided by buying the land. (*Id.* at ¶ 34.)  The parties recognized that plaintiff Bask could help facilitate this purchase by cancelling the Note and converting the $180,000.00 due to it from defendant into an equity interest in the development venture. (*Id.* at ¶ 35.)  Accordingly, Jetha and defendants began discussing terms by which Bask's equity conversion could be accomplished. (*Id.* at ¶ 36.)  Those discussions continued as the June 2, 2008 maturity date for the Note came and went. (DSMF [39] at ¶ 37.)  Plaintiff Bask did not demand payment of the Note at that time. (*Id.* at ¶ 38.)  To the contrary, Jetha told defendants that they could hold off on paying the Note while they negotiated terms of his equity participation. (*Id.* at ¶ 39.)

On June 3, 2008, Jetha proposed that he travel to American Hotel's corporate offices in Sarasota, Florida to discuss his equity participation in the project. (*Id.* at ¶ 40.)  At a June 11, 2006

5

meeting, the parties discussed the basic terms of Jetha's equity participation in detail. After the meeting concluded, a series of phone calls and emails were exchanged to finalize the deal. (*Id.* at ¶¶ 41-42.) In the wake of those communications, defendants aver that the Assignment Agreement had been modified as of June 27, 2008 to cancel defendants' obligations under the Note in exchange for American Hotel's immediate conveyance to Bask of (1) $180,000.00 imputed equity in the development venture, to be paid on a "pari passu"[4] basis with American Hotel or its principals, and (2) the right to receive one financing point (subject to the condition that the lender allow it). (DSMF [39] at ¶¶ 43-49.)

In purported reliance on Jetha's promises and representations, defendant American Hotel considered Jetha its "equity partner" in the development venture and authorized Jetha to continue his activities on the venture's behalf. (*Id.* at ¶¶ 53-54.) At this point, American Hotel contends that it would not have authorized Bask to continue to participate in the venture absent Jetha's assurance that the Note had been cancelled. (*Id.* at ¶ 54.)

---

[4] Although neither party defines this phrase, the Court assumes that it means that plaintiff's equity interest would be on equal footing with American Hotel. BLACK'S LAW DICTIONARY (9th ed. 2009)("Proportionally; act on equal pace; without preference.").

## III. POST-"MODIFICATION" CONDUCT

From June 27, 2008 forward, Jetha's actions were consistent with that of an equity partner in the venture. (*Id.* at ¶ 63.) He continued to seek financing for the development and referred to defendants as his "partners," when speaking with third parties. (*Id.* at ¶¶ 64-68.) In August 2008, it became apparent that Jetha's and American Hotel's efforts to obtain financing through traditional bank sources were increasingly futile, given the state of the economy. (DSMF [39] at ¶ 69.) Their focus shifted to finalizing the purchase of the Property so as to avoid incurring additional fees in connection with the Option Purchase Agreement extensions. (*Id.* at ¶ 70.) They reached a tentative agreement with Lake Dow wherein Lake Dow would finance the purchase of the land in exchange for a preferred equity interest and a 12% APR rate of return. (*Id.* at ¶¶ 71-72.) To facilitate this deal, Jetha contacted his transactional attorney Bob Ercole via email and requested assistance in setting up a structure to accomplish this arrangement. (*Id.* at ¶ 73.) In that email, Jetha provided Ercole with a summary of facts to assist with that task, stating, among other things, that "Bask McDonough has agreed to restructure the Assignment Contract and to convert the $180,000 promissory note into imputed equity for Salim Jetha on a 'pari passu' basis with the principals of [American Hotel]." (*Id.* at ¶ 74.)

7

The email containing this statement was forwarded to defendant Giannini and non-party Yanez, whereupon Giannini and Yanez promptly reviewed the email and shared it with defendant Harris. (*Id.* at ¶ 75.) Defendants all found Jetha's summary of the facts in the email to be consistent with their understanding of the parties' then-existing relationship. (*Id.* at ¶ 76.) They assert that, had they disagreed with the contents of Jetha's email, they would have addressed it with him immediately. (DSMF [39] at ¶ 77.)

In August or September 2008, defendant Giannini formed a limited liability company in anticipation of Lake Dow's participation in the venture, along with American Hotel and Bask as fellow members. (*Id.* at ¶¶ 78, 80.) Jetha had his attorney draft an operating agreement for the new company, but Lake Dow proposed some changes and the agreement was never signed. (*Id.* at ¶¶ 79, 81-82.) While negotiations continued, Jetha actively pursued construction financing for the project along with Harris and Giannini. In his communications with others, Jetha continued to reference himself as one of the principals of the project. (DSMF [39] at ¶¶ 83-88, 90, 92-102.)

On June 2, 2009, exactly one year after the Note had matured, Jetha attended a meeting with Lake Dow and Harris to further discuss the alternatives for payment of the Option Purchase Agreement extension fees. (*Id.* at ¶ 103.) This meeting did not go as well as

8

planned, and Jetha thought defendants Harris, Giannini, and American
Hotel were walking away from the deal. (*Id.* at ¶¶ 104-07.) Jetha
then sent an email stating that:

> I don't want to send the wrong message here but legally
> speaking, I don't want my input or action at anytime to be
> construed as a waiver or amendment to the contract [sic] of
> assignment from Bask [] to [American Hotel]. Those rights
> and obligations can only be changed by a specific written
> agreement. If that is not your understanding then please
> advise at once.

(*Id.* at ¶¶ 108-109.)

The email did not specifically reference the Note, and defendants
Harris and Giannini aver that they did not understand it to mean that
Jetha was attempting to preserve his ability to collect under the
Note, which they understood had already been canceled. (*Id.*
at ¶¶ 110-11.)

The Option Purchase Agreement with Lake Dow was extended, and
business continued as usual. (*Id.* at ¶¶ 113-14.) From July to
August 2009, Jetha continued to seek financing and sometimes referred
to himself as a "partner" of defendants. (DSMF [39] at ¶¶ 115-18.)
As the possibility of financing waned, defendant Giannini suggested
that Jetha hire defendant American Hotel to develop the Property.
(*Id.* at ¶ 119.) Jetha responded that the best he could do was keep
his $180,000.00 proceeds from the option assignment in the deal as an
equity contribution. (*Id.* at ¶ 120.) Defendants claim that they

AO 72A
(Rev.8/82)

relied on Jetha's representations in electing to continue pushing forward with the development venture. (*Id.* at ¶ 121.)

The search for investors continued and the Option Purchase Agreement with Lake Dow was extended once more on January 14, 2010. (*Id.* at ¶¶ 122-126.) "Deal fatigue" set in and little progress was made in the early part of 2010. (DSMF [39] at ¶¶ 130-36.) Jetha was also talking to his collection attorneys during that same time frame, as his attorneys served the first and only demand for payment of the Note on May 21, 2010. (*Id.* at ¶ 137.) At that point in time, the development was still a "going concern." (*Id.* at ¶ 138.) Defendants Harris and Giannini were shocked to discover that Jetha was attempting to collect on the Note, which they understood had been previously cancelled in exchange for equity in the venture. (*Id.* at ¶ 139.) According to defendant American Hotel, it would not have admitted Bask to an equity position in the venture had Jetha's promises, statements, and actions not led defendants to believe that the Note was cancelled as of June 27, 2008. (*Id.* at ¶ 140.) American Hotel also would not have continued to pay all the various extension fees to Lake Dow, nor would it have continued to dedicate man hours and other resources during this time. (DSMF [39] at ¶¶ 141-42.) Defendants rejected plaintiff's demand, and the present lawsuit was filed. (*Id.* at ¶ 143.)

10

<u>**ANALYSIS**</u>

**I.**   <u>**SUMMARY JUDGMENT STANDARD**</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where the moving party bears the burden of proof at trial, it must show affirmatively the absence of a genuine issue of material fact on all the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1114 (1993). An issue is material if, "under the applicable substantive law, it might affect the outcome of the case." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1189 (11th Cir. 2010). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Patton v. Triad Guar. Ins., Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002). Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue for trial. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

11

## II.  **THE NOTE**

Plaintiff seeks judgment on the Note. A creditor in possession of a valid and signed promissory note has a prima facie right of repayment, unless the debtor can establish a valid defense. *City of Bremen v. Regions Bank*, 274 Ga. 733, 740 (2002); O.C.G.A. § 11-3-308(b)[5]. An admission of indebtedness under a promissory note is sufficient to establish a prima facie case for recovery, and carries a plaintiff's initial burden of showing the absence of any material fact and of entitlement to judgment on the note. *Pollard v. First Nat'l Bank of Albany*, 169 Ga. App. 598, 598 (1984), disapproved on other grounds by *Branan v. Equico Lessors, Inc.*, 255 Ga. 718 (1986); *City of Bremen*, 274 Ga. at 739 (granting summary judgment where note was properly executed and valid on its face, and no legitimate affirmative defense to right to recover was asserted); *Smith v. Gordon*, 266 Ga. App. 814, 814 (2004)(same).

A debtor's denial of the debt for general reasons is insufficient to overcome the above-described prima facie right to repayment. *City of Bremen*, 274 Ga. at 739. Only a valid affirmative defense, such as estoppel, illegality, accord and satisfaction,

---

[5] "If the validity of signatures is admitted or proved and there is compliance with subsection (a) of this Code section, a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under Code Section 11-3-301, unless the defense proves a defense or claim in recoupment."

12

failure of consideration, and the like will suffice. *Id.* (relying on *Freezamatic Corp. v. Brigadier Indus., Corp.*, 125 Ga. App. 767, 768 (1972)).

Defendants admit that they executed the Note and have not paid the debt under the terms of the Note. Because they are in default of the Note as a result of failing to pay all amounts owed thereunder when due, plaintiff has made its prima facie case. Plaintiff will be entitled to summary judgment, unless defendants assert and provide evidence in support of a legitimate affirmative defense. Defendants raise three affirmative defenses in an effort to defeat summary judgment: modification, waiver, and estoppel.

## III. **AFFIRMATIVE DEFENSES**

### A. **Modification**

Defendants argue that the Assignment Agreement was modified to cancel defendants' obligations under the Note. Although defendants contend that the parties "modified" the agreement, it appears that they are actually arguing a defense of accord and satisfaction. An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions on this account. *Woodstock Road Inv. Prop. v. Lacy*, 149 Ga. App. 593, 593-4 (1979); O.C.G.A. § 13-4-101 (accord and satisfaction occurs where the parties to an agreement, by a subsequent agreement,

13

have satisfied the former agreement, and the latter agreement has been executed). Even if the accord and satisfaction is oral, defendants must still show that a "meeting of the minds" took place. *Wood v. Yancey Bros. Co.*, 135 Ga. App. 720, 721 (1975)("There is nothing to prevent an accord and satisfaction resulting from an oral transaction."). *King Indus. Realty, Inc. v. Rich*, 224 Ga. App. 629, 632 (1997)("As with any contract, establishment of an accord and satisfaction requires a showing that a meeting of the minds took place.").

Whether arguing a modification or an accord and satisfy, defendants essentially contend that the parties entered into a new contract in which plaintiff passed on its right to collect on the Note, in exchange for an equity interest in the potential hotel development and one financing point. Because defendants are arguing that the original contract was modified, or perhaps a new contract was formed, they must demonstrate that the change in obligations was the result of a "meeting of the minds." *Ga. Farm Bureau Mut. Ins. Co. v. Croley*, 263 Ga. App. 659, 661 (2003)(first requirement of a contract is that "there must be a meeting of the minds of the parties"). In this regard, Georgia law holds that:

> It is well established that no contract exists until all
> essential terms have been agreed to, and the failure to
> agree to even one essential term means that there is no
> agreement to be enforced. If a contract fails to establish
> an essential term, and leaves the settling of that term to

14

> be agreed upon later by the parties to the contract, the contract is deemed an unenforceable "agreement to agree." [A]s a rule, the consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition. Finally, a promise must be sufficiently definite as to both time and subject matter to be enforceable.

*Harmon v. Innomed Tech., Inc.*, 309 Ga. App. 265, 266-67 (2011) (citations omitted).

Defendants support their claim that plaintiff forsook his rights under the Note by relying on their own understanding of the modified agreement, on email exchanges that support their understanding, and plaintiff's long-term conduct that was allegedly consistent with the purported modification. A close review of defendants' "evidence," however, indicates that, with respect to converting defendants' $180,000.00 loan obligation into some form of equity interest for Jetha, the parties merely had an unenforceable "agreement to agree." *See Sierra Assoc., Ltd. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 169 Ga. App. 784, 788 (1984)("Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect."). As such, even accepting defendants' version of the events as true, the Court concludes that plaintiff is entitled to summary judgment.

There is no question that plaintiff Bask, through Jetha, was interested in developing the Property with American Hotel. Even

15

before the Note was executed, the parties floated the idea that Bask might eventually assume an equity position in a joint development venture with American Hotel. (DSMF [39] at ¶¶ 16-20.) As set out above, however, the inability to obtain financing led the parties to contemplate converting the $180,000.00 proceeds from the assignment into an equity interest in the development venture. These ongoing negotiations culminated in a June 2008 meeting where the basic terms of Jetha's equity participation were discussed in detail, but none of these discussions were ever memorialized in writing.[6] (DSMF [39] at ¶¶ 40-42; American Hotel Dep. [47] at 55.)

After this meeting concluded, a series of phone calls and emails were exchanged to finalize a deal between defendant American Hotel and Jetha. (DSMF [39] at ¶ 42.) Defendants contend that an email exchange in June 2008 gave rise to an enforceable agreement to cancel the Note. Specifically, on June 25, 2008, defendant Giannini asked Jetha to let American Hotel know his position on the proposed deal, stating "[i]t would...help if we knew one way or the other where you stood with us. We would like you to come in. Let us know your

---

[6] These negotiations extended past the Note's maturity date without any demand from plaintiff for payment, and plaintiff allegedly told defendants that they could hold off on paying the Note while they negotiated terms on his equity participation. (DSMF [39] at ¶ 39.)

16

decision?" (*Id.* at ¶ 43.) Jetha sent an email to Harris and Giannini responding as follows:

> My discussion with Clyde [Harris] at a very early point in the transaction was that I would contribute the $180,000 which would be treated as 'pari passu' with the balance of the equity. That is still okay with me today...If I will be required to execute a personal guarantee then the risk level will not make it worth my while to do anything other than on a pari passu basis with credit for the efforts to bringing [sic] the construction financing to the table. I am not suggesting cash but an increase in "imputed" equity...If this works for you then I am fine with leaving my $180,000 in the deal as long as you guys are in the deal at risk along with me.

(*Id.* at ¶ 45.)

The next day, Giannini emailed Jetha as follows: "Do we have a deal with you yet?" Jetha replied:

> I understood from my conversation with Clyde [Harris] this morning that he was going to discuss with you my proposal to have the $180,000 equity be "pari passu" with the balance of the equity. My impression is that you are okay with this. The second issue is compensation to me for the value in place my personal guarantee and for bringing a lender to the table. I feel that I should get credit for one point of the financing...which can be added to the equity contribution or paid in cash. That is where I left it with Clyde [Harris].

(*Id.* at ¶ 46.)

Giannini responded:

> "I was not aware of the second issue as you describe it. Do you think Omni Bank would allow this expense off the development budget to you for that one financing point if you end up being a guarantor on the debt as well?" (*Id.* at ¶ 47.)

Jetha then stated:

17

"If the bank was not willing to do this we can work something out. You will [not] be disappointed in my efforts to be an agreeable partner." (*Id.* at ¶ 48.)

Based on these exchanges, defendants contend that the Assignment Agreement had been modified as of June 27, 2008 to cancel defendants' obligations under the Note in exchange for American Hotel's immediate conveyance to Bask of (1) $180,000.00 imputed equity in the development venture, to be paid on a "pari passu" basis with American Hotel or its principals, and (2) the right to receive one financing point, subject to the condition that the lender allow it. (*Id.* at ¶ 49.)

To the contrary, the email exchanges demonstrate that the parties had yet to reach a final agreement. Jetha's responses to defendant Giannini's overtures are conditional. He never affirmatively states that they have a deal and he merely suggests he receive one financing point as part of the transaction. With respect to the financing point proposal, he leaves the situation open by expressing a willingness to "work something out," depending on how a lender responds. His remark that "[y]ou will not be disappointed in my efforts to be an agreeable partner" also looks to future negotiations. Under the putative modification, the parties would still have had to finalize an operating agreement for the development

of the venture[7], convey $180,000.00 worth of imputed equity from defendants' venture to plaintiff, and perhaps give plaintiff a financing point from an as yet undetermined lender. This email exchange hardly displays a "meeting of the minds" over the cancellation of the $180,000.00 obligation. At best, it is an "agreement to agree," as terms that were allegedly specified within the modification are "tempered by alternative and otherwise subject to unspecified future changes." *Harmon*, 309 Ga. App. at 267.[8]

The alleged modification also lacks essential terms. Although the proposed modification contemplates plaintiff Bask's equity participation in the venture, this modification is silent about the percentage of his ownership, how the entity would be structured, and when the equity conversion would occur. The absence of these

---

[7] While the parties did craft an operating agreement for this tentative venture, which would have made Bask a partner with American Hotel and Lake Dow, the agreement was never finalized or signed.

[8] As further evidence that the parties' agreement was indefinite, plaintiff points out that American Hotel did not notify a hotel group franchisor that plaintiff was a part-owner of the development entity, as it would have been obligated to do so in a franchise agreement. (Reply Br. [47] at 13-14.) Defendants argue that the delay in claiming plaintiff as a part-owner in the franchise agreement was to avoid costly amendments. (Resp. Br. [37] at 10 n.2.) Because the final deal might involve additional owners, defendants indicate that they only wanted to amend the franchise agreement once, after the development entity was finalized. (DSMF [39] at ¶¶ 55-62.) Of course, this explanation confirms that the deal with plaintiff was not nailed down, and could change, depending on the later addition of third parties.

essential terms renders the "modification" unenforceable. *See Massih v. Mulling*, 271 Ga. App. 685, 686-87 (2005)(oral agreement to serve as president of new company in exchange for 20% ownership unenforceable where parties did not decide when president would receive her ownership interest or how company would be structured); *Burns v. Dees*, 252 Ga. App. 598, 602-03 (2001)(finding no enforceable contract for sale of venture where agreement did not define when sale would take place, how costs or losses would be allocated, or how proceeds would be calculated or distributed); *Lemming v. Morgan*, 228 Ga. App. 763 (1998)(finding oral agreement to purchase, develop, and resell property unenforceable because it had no specific provisions regarding when transfer of title, division of proceeds, or sale of property would take place, how costs would be allocated, and how proceeds would be calculated).

Defendants acknowledge the uncertainties in the agreement, as they contend that, around the time the alleged modification occurred, "it was understood that additional investors and/or lenders would later become affiliated with the venture, thus requiring the various participants to finalize the profit sharing and control arrangements in a separate syndication agreement once all investors and lenders were in the deal." (DSMF [39] at ¶ 51.) Of course, the addition of later investors would require changes to an essential term of the proposed venture—the percentage of ownership—which the parties had

20

not yet even defined. Despite defendants' contention that this "modification" would "allow[ American Hotel] and [Bask] to have an understanding as to their rights and obligations with respect to each other as they related to the venture in the interim[,]" (*id.* at ¶ 52), it does not delineate the essential terms necessary to form an enforceable contract.

Defendants argue that, even if the agreement lacks enough definite terms to be enforceable, such agreements may become enforceable due to the subsequent actions of the parties. Part performance of the terms of a contract can be evidence of the acceptance of the terms of an otherwise indefinite contract. *See Sanders v. Commercial Cas. Ins. Co.*, 226 Ga. App. 119, 121 (1997)("an objection of indefiniteness may be obviated by performance on the part of one party and the acceptance of the performance by the other."). Defendants do not make clear exactly what portion of the "modified" agreement they, or plaintiff, performed. No operating agreement setting forth Bask's ownership interest in the venture was ever finalized and Bask never cancelled the Note.

Moreover, Bask's delay in seeking payment was well within its rights under the Note itself, which provides that "[e]ach obligor hereby expressly consents to any and all extensions, modifications, and renewals, in whole or in part, including but not limited to...all delays in time of payment or other performance which holder may grant

21

or permit at any time and from time to time without limitation and without any notice to or further consent of any obligor." (Note, attached to Jetha Aff. [33] at Ex. 1.) While Jetha certainly behaved as if he was an active part of the effort to complete the deal, such behavior was not inconsistent with his long-standing efforts to help obtain financing for the development, which would hopefully have brought the venture enough money to pay off the $180,000.00 Note. Indeed, when it appeared that the potential deal was going south, he asserted that he had no intention of waiving any rights he held under the Assignment Agreement. In sum, there was no "part performance" that requires disregard of the indefiniteness and incompleteness of the alleged agreement. Defendants have therefore not raised a triable issue of fact to defeat plaintiff's Motion for Summary Judgment on this Ground.

**B. Waiver**

Defendants' argument that plaintiff waived his right to collect on the Note is also without merit. They contend that Jetha's course of conduct--presumably offering support and advice, as would a partner, and his failure to demand the Note in a timely fashion--creates a jury question as to whether plaintiff waived its right to collect. Georgia law recognizes that a party to a contract may waive a contractual right by acting in a manner inconsistent with such right. *See* O.C.G.A. § 13-4-4; *Crawford v. First Nat'l Bank*, 137 Ga.

22

App. 294, 295 (1976)("provisions of a written contract may be waived by acts or conduct which justify the other party to believe the express provisions are waived, and even a contractual provision against waiver may be waived by conduct."). This waiver, however, must be evidenced by a "mutual[] depart[ure] from the terms of the original agreement." *Prudential Ins. Co. v. Nessmith*, 174 Ga. App. 39, 40 (1985). This "modification, when taken in connection with the original contract, will provide a new and distinct agreement complete in its terms." *Eaves v. J.C. Bradford & Co., Inc.*, 173 Ga. App. 470, 471 (1985)). An "agreement" requires a meeting of the minds. *Id.*

Plaintiff never behaved as if it was definitely and irrevocably foregoing its right to collect the $180,000.00. At most, the attempted modification was an effort to convert the debt into another form of value. While defendants might have thought plaintiff intended to waive the debt, the intention was not mutual. *See Crawford*, 137 Ga. App. at 296 (debtor's intention to treat time of payment schedule as waived where bank accepted late payments did not reflect mutual intention to waive).

Moreover, under the Note, defendants expressly consented to delays in the payment. As such, the fact that plaintiff delayed over two years in seeking payment is no basis for claiming that plaintiff waived any right under the Note. *Trendmark Homes, Inc. v. Bank of N. Ga.*, 314 Ga. App. 886 (2012)(noting clauses in promissory note that

23

waived debtor's right to object in concluding that creditor did not waive right to collect on note).

### C. Estoppel

"In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury." *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 94 (2011). Similarly, under the doctrine of promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Ga. Inv. Int'l, Inc. v. Branch Banking & Trust Co.*, 305 Ga. App. 673, 675 (2010).

Defendants are not entitled to equitable estoppel as they put forth no evidence that plaintiff deceived them. Morever, promissory estoppel does not apply to vague or indefinite promises, promises of uncertain duration, or promises concerning unenforceably vague future acts. *Id.; Bridges v. Reliance Trust Co.*, 205 Ga. App. 400, 402 (1992)("estoppel applies to representations of past or present facts and not to promises concerning the future, especially where those promises concern unenforceably vague future acts"). As explained above, the alleged "modification" is too vague and indefinite to

24

create an enforceable promise. Accordingly, defendants' estoppel defense fails. *See Secured Realty & Inv., Inc. v. Bank of N. Ga.*, 314 Ga. App. 628 (2012)(rejecting estoppel defense where debtor offered no evidence of deception and there was no evidence of specific terms and conditions of any promise to renew loan); *Bridges*, 205 Ga. App. 400 (rejecting promissory estoppel where bank promised to work something out regarding future additional loans).

## II. <u>AMOUNT DUE UNDER THE NOTE</u>

Plaintiff avers that as of November 4, 2011, the amount owed pursuant to the Note was $180,000.00 plus accrued interest of $31,482.74 and costs of collection, including, without limitation, attorney's fees. (Jetha Aff. [33] at ¶ 16.) Per the terms of the Note, interest continues to accrue at the default rate of 12%. (Note, attached to Jetha Aff. [33].) This Order is being issued on **August 24, 2012**. Plaintiff shall provide its proposed judgment, with accompanying explanation of its methodology for calculation, by **September 7, 2012**. Defendants will have until **September 21, 2012** to contest any calculations. Assuming no challenges to the calculations, the Court intends to issue its judgment by **September 30, 2012**.

AO 72A
(Rev.8/82)

## III. **ATTORNEY'S FEES**

Plaintiff also seeks attorney's fees. Under O.C.G.A. § 13-1-11(a), "[o]bligations to pay attorney's fees upon any note or other evidence of indebtedness, in addition to the rate of interest specified therein, shall be valid and enforceable and collectable as a part of such debt if such note or other evidence of indebtedness is collected by or through an attorney after maturity." The Note provides that the obligors "agree that if this Note becomes in default and is placed in the hand of an attorney for collection, to pay reasonable attorney's fees for negotiations, trial, appellate proceedings or other legal services, and all costs of collection." (Note, attached to Jetha Aff. [33].) This agreement to pay attorney's fees is enforceable. Plaintiff's Motion for Summary Judgment [33] as to attorney's fees is therefore **GRANTED**.

Plaintiff has not submitted a proposed award of attorney's fees, nor a proposed judgment. The Court notes, however, that Georgia law imposes limitations on the award of attorney's fees in collection cases. Under O.C.G.A. § 13-1-11(a)(2), if the note "provides for the payment of reasonable attorney's fees without specifying any specific percent, such provision shall be construed to mean 15 percent of the first $500.00 of principal and interest owing on such note or other evidence of indebtedness and 10 percent of the amount of principal and interest owing thereon in excess of $500.00." The Note only

26

specifies recovery of reasonable attorney's fees.  It follows that plaintiff's proposed judgment for an award of attorney's fees should adhere to the above subsection.

### CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment [33] is **GRANTED**.  As set out above, plaintiff shall submit a proposed judgment by **September 7, 2012**.  Should defendants contest these figures, defendants must do so by explaining why plaintiff's figures are not accurate and what the correct calculation should be, by **September 21, 2012**.

SO ORDERED, this <u>24th</u> day of AUGUST, 2012.

<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)